**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

**SHELL OFFSHORE, INC.**                                                              **CIVIL ACTION**

**VERSUS**                                                                                    **NO. 13-6278**

**TESLA OFFSHORE, L.L.C., ET AL.**                                      **SECTION I**

<u>**ORDER AND REASONS**</u>

Before the Court is a motion[1] for partial summary judgment filed by defendants, International Offshore Services, L.L.C. and International Marine, LLC (collectively, "International"). Plaintiff, Shell Offshore Inc. ("Shell"), and defendant, Tesla Offshore LLC ("Tesla"), oppose the motion.[2] For the following reasons, the motion is **GRANTED IN PART AND DENIED IN PART**.

**BACKGROUND**

For the purposes of deciding this motion, the material facts are straightforward and undisputed. Tesla time-chartered the M/V INTERNATIONAL THUNDER from International for the purpose of conducting an underwater archeological survey of the seafloor.[3] Tesla installed surveying equipment on the THUNDER, including a sonar "towfish" ("fish"), which was an 89" metal tube towed by a winched cable.[4] On November 2, 2012, while the "fish" was deployed from and being pulled by the THUNDER at the end of 14,000 feet of cable, the fish hit a mooring line holding in place the DEEPWATER NAUTILUS, a drilling rig owned by Shell.[5] This case arises out

---

[1]R. Doc. No. 152.
[2]R. Doc. Nos. 156, 157.
[3]*See* R. Doc. No. 152-1, at 1-2; R. Doc. No. 156-7, at 1; R. Doc. No. 157-3, at 1.
[4]*See* R. Doc. No. 152-1, at 1-3; R. Doc. No. 156-7, at 1-2; R. Doc. No. 157-3, at 1-2.
[5]*See* R. Doc. No. 152-1, at 4; R. Doc. No. 156-7, at 2; R. Doc. No. 157-3, at 3.

of that alleged allision.

**STANDARD**

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's]

favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## ANALYSIS

International moves for partial summary judgment as to three issues: (1) whether Tesla's fish was a vessel, (2) whether the THUNDER pulling the fish behind it constitutes "towing" in a legal sense, and (3) whether Tesla was solely responsible for its personnel and operation of the fish.

**A.      Was the THUNDER "Towing" the Fish?**

The THUNDER pulled the fish behind it on a long cable. Any ordinary person would describe this as "towing," and International concedes that the participants in this case, counsel for International included, have likewise used that term.[6] Indeed, some witnesses refer to the fish as a "towfish."[7] Before attaching legal consequences to that characterization, however, the Court must be more precise and apply whatever definition of "towing" pertains to the potentially applicable law. *Cf. Anderson*, 477 U.S. at 248 ("As to materiality, the substantive law will identify which facts are material."). The parties agree that whether the THUNDER was engaged in "towing" the fish is a question of law based on undisputed facts.[8]

According to International, "both Shell and Tesla have sought to characterize the Tesla survey work as actual towage within the meaning of the maritime law, and have had their experts

---

[6]*See* R. Doc. No. 152-2, at 12-13 ("Throughout much of this litigation, both the witnesses and the attorneys (undersigned counsel included) have casually and colloquially referred to what the THUNDER was doing at the time of this alleged allision as towing.").

[7]R. Doc. No. 156-2, at 6.

[8]*See* R. Doc. No. 152-2, at 21; R. Doc. No. 156, at 6. The Court notes that in response to a request for admission from Shell pursuant to Rule 36 of the Federal Rules of Civil Procedure, International admitted that "on November 2, 2012, underwater survey equipment was being towed behind the vessel." R. Doc. No. 156-3, at 2. Although a matter admitted pursuant to Rule 36 "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended," the Court does not attach conclusive weight to the admission for the purpose of deciding this question of law. Fed. R. Civ. P. 36(b).

criticize the master of the THUNDER on duty at the time of the allision for not having a towing endorsement."[9] A Coast Guard regulation states that, "No person may serve as a master or mate (pilot) of any *towing vessel* without meeting the requirements of §§ 15.805(a)(5) or 15.810(d) of this part." 46 C.F.R. § 15.910 (emphasis added).[10] The United States Code defines "towing vessel" as "a commercial vessel engaged in or intending to engage in the service of pulling, pushing, or hauling along side, or any combination of pulling, pushing, or hauling along side." 46 U.S.C. § 2101(40).[11]

The THUNDER was indisputably a commercial vessel, and it indisputably engaged in the service of pulling–it pulled the fish. The plain language of § 2101(40) therefore dictates that the THUNDER was a "towing vessel" for the purposes of the licensing requirement of 46 C.F.R. § 15.910. There appears to be no fact dispute that Captain Lequeux, the master of the THUNDER at the time of the incident, did not have the requisite towing endorsement.[12]

International contends that this seemingly straightforward interpretation is wrong because "towage under the maritime law consists of one vessel assisting in the movement of another vessel, and the Tesla fish was not a vessel."[13] According to International, although the THUNDER pulled the fish behind it, it did not "tow" the fish; therefore it was not a "towing vessel," and the license requirement does not apply. However, the Court is not persuaded by International's argument that towing is limited solely to vessels pulling other vessels for the purposes of 46 U.S.C. § 2101(40) and

---

[9] R. Doc. No. 152-2, at 13.
[10] Sections 15.805(a)(5) and 15.810(d) set forth the requisite credentials for a master or mate of a towing vessel.
[11] No party suggests that the definition of "towing vessel" in 46 U.S.C. § 2101(40) does not apply to 46 C.F.R. § 15.910. Moreover, § 2101 is found in the same subtitle of the United States Code as the provision authorizing "regulations to carry out the provisions of this subtitle." 46 U.S.C. § 2103.
[12] *See* R. Doc. No. 156, at 4; R. Doc. No. 156-5.
[13] R. Doc. No. 152-2, at 13.

4

46 C.F.R. § 15.910.

First, International relies heavily on the Supreme Court's statement in *Sacramento Navigation Co. v. Salz* that "[t]owage service is the employment of one vessel to expedite the voyage of another." 273 U.S. 326, 328 (1927). But *Sacramento Navigation* involved a different issue; in that case, a tug negligently pushed a barge into an anchored vessel, resulting in the loss of the barge's cargo. *See id.* at 327. Before the Supreme Court, "the sole question to be determined [was] whether the barge alone, or the combination of tug and barge, was the 'vessel transporting' the cargo" for the purposes of a federal statute limiting a vessel owner's liability. *Id.* at 328. The Supreme Court touched on the meaning of "towage service" as part of its analysis of whether a relevant contract was a contract of towage or a contract of affreightment. *See id.* at 328. In light of the narrow issue presented in *Sacramento Navigation*, the Supreme Court's explanation of "towage service" can hardly be read as a conclusive definition of "towing" for all possible purposes. The Fifth Circuit opinions cited by International are similarly narrow and do not purport to offer a global definition of "towing" applicable to these circumstances. *See Miss. Valley Barge Line Co. v. T.L. James & Co.*, 244 F.2d 263, 267 (5th Cir. 1957) (addressing same towage/carriage contract issue as *Sacramento Navigation*); *Miss. Valley Barge Line Co. v. Indian Towing Co.*, 232 F.2d 750, 753 & n.5 (5th Cir. 1956) (contrasting towage versus salvage of a vessel).

Second, International cites various regulations applicable to "towing vessels."[14] For example, the Vessel Bridge-to-Bridge Radiotelephone Act defines "towing vessel" as "any commercial vessel engaged in towing another vessel astern, alongside, or by pushing ahead." 33 C.F.R. § 26.02. The Inland Navigation Rules likewise impose requirements on "vessel[s] engaged in towing or pushing

---

[14]*See* R. Doc. No. 152-2, at 14-16.

another vessel." *See* 33 C.F.R. § 83.35(c). International also cites proposed regulations governing inspection of towing vessels.[15] But International has not explained how this case involves application of the Vessel Bridge-to-Bridge Radiotelephone Act, the Inland Navigation Rules, or vessel inspection rules which have yet to be implemented, so it is irrelevant whether the THUNDER was a "towing vessel" for those purposes.[16] For this motion and this case, the Court need merely apply the plain language of § 2101(40), which defeats International's contention that as a matter of law only other vessels can be "towed."[17]

International also offers a creative albeit unsuccessful argument based on the terms of the International/Tesla time charter. The time charter assigns to Tesla all responsibility and liability for damage to Tesla's property.[18] According to International, if the THUNDER was towing the fish, then that "clause would be an impermissible 'exculpatory clause' in violation of the longstanding

---

[15]R. Doc. No. 152-2, at 15-16.

[16]In its opposition, Shell also cites portions of the International Convention on the Regulations for Preventing Collisions at Sea which contemplate vessels towing other vessels or objects. R. Doc. No. 156, at 7-8. Those rules also have no articulated bearing on the issues in this case or the interpretation of "towing vessel" for the purposes of the relevant licensing regulation.

[17]No "absurd results" will follow because the Court is not defining "towing" for all possible purposes. The Court simply does not have to decide the non-issue of how those other regulations might or might not have applied to the THUNDER while it pulled the fish. Likewise, whether vessels are "towing" when pulling a fishing net or a water-skier are purely hypothetical questions left for another case actually presenting those facts.

The Court notes that the Supreme Court in *Lozman v. City of Riviera Beach* described a vessel pushing or pulling a non-vessel houseboat as towing. *See* 133 S. Ct. 735, 741 (2013) (explaining that a non-vessel houseboat "was able to travel over water only by being towed" and that the "home's travel by tow over water took place on only four occasions over a period of seven years"). Although this was not a disputed issue presented in that case, this usage suggests a practical, common-sense understanding of "towing" that recognizes the possible safety implications whenever a vessel is pushing or pulling something potentially dangerous, whether or not that thing is a vessel. *Cf. id.* ("And when the home was towed a significant distance in 2006, the towing company had a second boat follow behind to prevent the home from swinging dangerously from side to side.").

[18]R. Doc. No. 152-7, at 10.

6

*Bisso* rule preventing tug owners from shifting liability to the tow," which the parties could not have intended.[19] That these particular private entities may have drafted a contract provision with unforeseen consequences is hardly probative of how a federal regulation should be interpreted. Accordingly, this argument is unpersuasive.[20]

It is appropriate to reiterate the precise scope of the Court's holding. The Court does not hold that "a vessel is 'towing' when it is pulling anything, for any purpose," as International insists.[21] Rather, the Court concludes that a vessel can "tow" something that is not a vessel for the purposes of 46 C.F.R. § 15.910 because a "towing vessel" for the purposes of that regulation is defined in terms of the activity and not what is being towed. International offers no argument why the THUNDER was not "towing" the fish other than its proposed categorical rule that only vessels can be towed which argument the Court rejects. Moreover, it is reasonable to conclude that a vessel pulling a seven-and-a-half foot metal object at the end of 14,000 feet of cable is "towing" that object. Accordingly, on the facts of this case, the Court concludes that the THUNDER was a "towing vessel" for the purposes of 46 C.F.R. § 15.910 when it towed Tesla's fish.

Because the Court rejects International's contention that towing is limited to one vessel assisting the movement of another vessel, the vessel status of the fish is immaterial to deciding International's motion. The Court declines to reach that issue unnecessarily.

**B.     Tesla's Control of the Fish**

Finally, International moves for partial summary judgment with respect to Tesla's control

---

[19]R. Doc. No. 152-2, at 17 (citing *Bisso v. Inland Waterways Corp.*, 349 U.S. 85 (1955)).
[20]The validity of that provision of the time charter agreement has not been raised in any motion and the Court expresses no opinion as to that issue.
[21]R. Doc. No. 152-2, at 16 (emphasis omitted).

7

over the fish. According to International, there is no genuine issue of material fact that "Tesla, as the time charterer of the THUNDER, was solely responsible for its employees aboard the THUNDER and for the safe operation of the equipment it installed or brought aboard the THUNDER, including but not limited to when, where, and how deep to deploy the Tesla fish."[22] In its reply brief, International narrows that phrasing slightly and asserts its entitlement to "partial summary judgment finding that Tesla had complete operational control over the decisions as to when, where, and how deep to deploy the fish."[23] On the basis of this purportedly undisputed fact, International "respectfully submits that Tesla bears full responsibility for any damages that flow from its operation of its equipment."[24]

In its opposition, Tesla admits as undisputed that, "Tesla personnel alone decided when to deploy the Tesla fish into the water from the stern of the THUNDER"[25] and "Tesla personnel alone decided how much cable to let out from the Tesla winch on the THUNDER."[26] But Tesla disagrees that it had sole control of the depth of the fish, which it contends was at least partially attributable to the speed of the THUNDER, which was in the ultimate control of the master of the vessel.[27]

Genuine disputes of material fact as to the division of ultimate control over the depth of the fish preclude partial summary judgment as requested by International. Deposition testimony suggests that the depth of the fish was determined both by the length of the cable let out by Tesla

---

[22] R. Doc. No. 152-2, at 1.
[23] R. Doc. No. 162, at 2.
[24] R. Doc. No. 152-2, at 19.
[25] R. Doc. No. 152-1, ¶ 16; R. Doc. No. 157-3, at 2 ¶ 16.
[26] R. Doc. No. 152-1, ¶ 17; R. Doc. No. 157-3, at 2 ¶ 17.
[27] R. Doc. No. 152-1, ¶¶ 18, 22; R. Doc. No. 157-3, at 3 ¶¶18, 22. In its opposition, Shell asserts that it "does not oppose International's requested relief concerning Tesla's role as time charterer in charge of decisions concerning deployment and retrieval of the THUNDER's tow."). R. Doc. No. 156, at 2 n.2.

and by the speed of the THUNDER.[28] The time charter agreement placed the master of the THUNDER "under the general direction of [Tesla]," and required that the master "not unreasonably refuse any request to undertake operations or carry out any order or direction specified by [Tesla]."[29] But the time charter is also clear that the master must "determine whether operations requested by [Tesla] can safely be undertaken and whether his vessel is capable of undertaking or being employed to carry out the directions and orders of [Tesla]."[30] In addition, it is not clear whether, at the time of the incident, Tesla had directed the master of the THUNDER to move at any particular rate of speed.[31]

Drawing all inferences in Tesla's favor as the non-movant, the Court cannot hold as a matter of law that Tesla was *solely* responsible for the depth of the fish at the time of the incident. International's requested "finding that Tesla is solely liable for the acts and omissions of its employees on the THUNDER and for the operation of its equipment, including but not limited to the fish" must be denied.[32] However, the motion is granted with respect to the undisputed facts that (1) Tesla personnel alone decided when to deploy the Tesla fish into the water from the stern of the Thunder, and (2) Tesla personnel alone decided how much cable to let out from the Tesla winch on the THUNDER. Accordingly,

**IT IS ORDERED** that International's motion for partial summary judgment is **GRANTED** with respect to the undisputed facts that (1) Tesla personnel alone decided when to deploy the Tesla fish into the water from the stern of the Thunder, and (2) Tesla personnel alone decided how much

---

[28]R. Doc. No. 152-4, at 14-15.
[29]R. Doc. No. 152-7, at 7.
[30]R. Doc. No. 152-7, at 7.
[31]R. Doc. No. 152-4, at 8.
[32]R. Doc. No. 152-2, at 21.

cable to let out from the Tesla winch on the THUNDER, but **DENIED** in all other respects.

New Orleans, Louisiana, February 18, 2015.

*[signature]*

**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**