UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SHELL OFFSHORE, INC.                                          CIVIL ACTION

VERSUS                                                                    NO. 13-6278

TESLA OFFSHORE, L.L.C., ET AL.                         SECTION I

### ORDER AND REASONS

Before the Court is a motion[1] filed by plaintiff, Shell Offshore Inc. ("Shell") to exclude Safety and Environmental Management Systems ("SEMS") regulations, and related exhibits and expert testimony. Oppositions have been filed by defendant, Tesla Offshore LLC ("Tesla"),[2] and defendants, International Offshore Services, L.L.C. and International Marine, LLC (collectively, "International").[3] The motion is granted in part and denied in part as set forth herein.

### BACKGROUND

For the purposes of deciding this motion, the material facts are straightforward and undisputed. Tesla time-chartered the M/V INTERNATIONAL THUNDER from International for the purpose of conducting an underwater archeological survey of the seafloor.[4] Tesla installed surveying equipment on the THUNDER, including a sonar "towfish" ("fish"), which was an 89" metal tube towed by a winched cable.[5] On November 2, 2012, while the "fish" was deployed from and being pulled by the THUNDER at the end of 14,000 feet of cable, the fish hit a mooring line

---

[1] R. Doc. No. 176.
[2] R. Doc. No. 187. Third-party defendant, Sea Eagle Fisheries, Inc. ("Sea Eagle"), filed an opposition adopting Tesla's opposition. R. Doc. No. 201.
[3] R. Doc. No. 199.
[4] *See* R. Doc. No. 152-1, at 1-2; R. Doc. No. 156-7, at 1; R. Doc. No. 157-3, at 1.
[5] *See* R. Doc. No. 152-1, at 1-3; R. Doc. No. 156-7, at 1-2; R. Doc. No. 157-3, at 1-2.

holding in place the DEEPWATER NAUTILUS, a mobile offshore drilling unit ("MODU") owned by Shell.[6] This case arises out of that alleged allision, as do many evidentiary disputes.

## ANALYSIS

Shell's motion challenges the admissibility of (1) safety and environmental management system ("SEMS") regulations promulgated by the Bureau of Safety and Environmental Enforcement ("BSEE"); (2) documents prepared by Shell and Transocean[7] pursuant to those regulations; and (3) expert testimony regarding the regulations and the documents.[8] The briefing by all parties frequently does not differentiate between the evidentiary issues presented by the regulations themselves and materials prepared in response to those regulations, but the Court finds it helpful to analyze each category of evidence separately.

**A.     SEMS Regulations**

Part 250 of title 30 of the Code of Federal Regulations "contains the regulations of the BSEE Offshore program that govern oil, gas, and sulphur exploration, development, and production operations on the [Outer Continental Shelf]." 30 C.F.R. § 250.102(a). Subpart S of part 250 governs SEMS programs. *See* 30 C.F.R. § 250.1900 ("You must develop, implement, and maintain a . . . (SEMS) program."). The "goal of [the] SEMS program is to promote safety and environmental protection by ensuring all personnel aboard a facility are complying with the policies and procedures identified in [the] SEMS." *Id.* § 250.1901. Accordingly, regulated entities "must ensure that [the]

---

[6]*See* R. Doc. No. 152-1, at 4; R. Doc. No. 156-7, at 2; R. Doc. No. 157-3, at 3.
[7]"Shell had contracted with Transocean to provide the NAUTILUS drilling rig for operations in the Gulf of Mexico." R. Doc. No. 171, at 26. "Shell is responsible under its contract with Transocean for Transocean's fault of the [DEEPWATER] NAUTILUS, which caused or contributed to the incident." R. Doc. No. 171, at 28.
[8]*See* Fed. R. Evid. 703.

SEMS program identifies, addresses, and manages safety, environmental hazards, and impacts during the design, construction, start-up, operation (including, but not limited to, drilling and decommissioning), inspection, and maintenance of all new and existing facilities, including mobile offshore drilling units (MODUs) when attached to the seabed." *Id.* § 250.1901(a). The SEMS regulations expressly are not intended to "affect[] safety or other matters under the jurisdiction of the Coast Guard." *Id.* §250.1900(b).

According to Shell, the SEMS regulations should be excluded because they govern only the "industrial function" of drilling rigs and "are inapplicable to the sorts of maritime issues that have arisen in this case."[9] Tesla does not clearly articulate a basis for the admissibility of the SEMS regulations in this case, except to assert that the SEMS regulations address safety and are expressly applicable to MODUs such as the DEEPWATER NAUTILUS.[10] According to International, because the SEMS regulations are intended "to promote safety and environmental protection," 30 C.F.R. § 250.1901, and are expressly applicable to MODUs such as the DEEPWATER NAUTILUS, they are relevant to this case because "prudent seamanship serves to 'promote safety and environmental protection.'"[11]

The parties have not cited any cases or other authorities addressing the applicability of the SEMS regulations with respect to an allision between a sonar towfish and a MODU mooring line. Certainly, the SEMS regulations apply to the DEEPWATER NAUTILUS and are safety-related in a general sense. *See* 30 C.F.R. § 250.1901(a). However, not every safety regulation generally

---

[9]R. Doc. No. 176-1, at 2-3; *see also* R. Doc. No. 176-1, at 4 ("Simply put, SEMS regulations do not apply to the marine aspects of a MODU and are therefore irrelevant to this classic maritime collision case and should not be admitted.").
[10]*See* R. Doc. No. 187, at 2-4.
[11]R. Doc. No. 199, at 6-7.

3

applicable to the DEEPWATER NAUTILUS would be material to the factual and legal issues in this case.

Neither Tesla nor International has articulated how the SEMS regulations, though safety-oriented, apply to the safety issues arising out of the maritime allision that occurred in this case or dictate any action that Shell or Transocean should have, but did not, take. Tesla asserts that "BSEE and [the] USCG share jurisdiction" over MODUs such as the DEEPWATER NAUTILUS.[12] But that fact is not disputed[13] and it does not explain why the BSEE's SEMS regulations, although applicable to the DEEPWATER NAUTILUS, have any bearing on the facts of this case.[14] Likewise, International's contention that "prudent seamanship serves to 'promote safety and environmental protection'" falls well short of explaining how the SEMS regulations establish the content of any standard for prudent seamanship that Shell or Transocean allegedly violated in this case.[15] To the contrary, as noted above, the SEMS regulations themselves plainly state that they are not intended

---

[12] R. Doc. No. 187, at 9.

[13] Indeed, Shell, in the first sentence of the memorandum in support of its motion, states that "[o]perations on the Outer Continental Shelf are extensively regulated by two federal agencies: the Department of Homeland Security (United States Coast Guard) and the Department of the Interior [('BSEE')]." R. Doc. No. 176-1, at 1.

[14] Tesla refers to two provisions of the SEMS regulations which refer to other requirements separately established by the U.S. Coast Guard. R. Doc. No. 187, at 9. Section 250.1931 states that a "SEMS program must have a process to identify the individual with the [Ultimate Work Authority]" on a facility, which individual must be designated "taking into account all applicable USCG regulations that deal with designating a person in charge of an OCS facility." 30 C.F.R. § 250.1931(a). Section 250.1933 states that a "SEMS program must include procedures for all personnel to report unsafe working conditions," which procedures "must take into account applicable USCG reporting requirements for unsafe working conditions." 30 C.F.R. § 250.1933(a). It suffices to point out that Tesla has not explained how either of these provisions found in the SEMS regulations has any bearing on this matter.

The Court also notes that 30 C.F.R. § 250.1911 requires development and implementation of a hazards analysis, but it does not mandate any particular hazards that must be addressed.

[15] R. Doc. No. 199, at 7.

to "affect[] safety or other matters under the jurisdiction of the Coast Guard," 30 C.F.R. §250.1900(b), which supports Shell's argument that the SEMS regulations requiring creation of a SEMS program are not directed towards navigational safety and, therefore, not pertinent to the issues in this case.

In light of the foregoing, there is no apparent evidentiary basis for admission of the SEMS regulations themselves as exhibits at trial. On the other hand, it is also not clear that the existence of the SEMS regulations should be a completely forbidden topic at trial; for example, as will be explained below, the Court finds that documents prepared by Shell and Transocean *pursuant to* the SEMS regulations appear to be admissible, and some general testimony regarding the SEMS regulations, subject to cross-examination, may be appropriate in order to provide context for the jury. The Court is unable to determine the precise contours of these evidentiary issues without the benefit of the context to be provided at trial and expert testimony from the parties. Accordingly, Shell's *in limine* motion to exclude the SEMS regulations should be denied at this time without prejudice to any party's right to raise specific objections at trial.

## B.     Shell and Transocean SEMS Documents

Shell also moves to exclude certain documents prepared by Shell and Transocean pursuant to those SEMS regulations.[16] As noted above, the SEMS regulations require preparation of a SEMS

---

[16]Although it asserts that its motion includes other unmentioned documents, Shell did not attach as exhibits to its motion the documents it seeks to exclude, nor did it identify any documents to be excluded other than a "Shell/Transocean SEMS Bridging Agreement." R. Doc. No. 176-1, at 4. In their oppositions, Tesla and International provide and cite to a "SEMS Interface Document" between Shell and Transocean, which is the same document referred to by Shell. *See* 165-1, at 13-14 (proposed pretrial order identifying "Shell/Transocean SEMS Interface or Bridging Agreement; SOI 001076"). Tesla also bases arguments on a Transocean "Health and Safety Environment Case" for the DEEPWATER NAUTILUS, R. Doc. No. 187-2, at 1-4, and a "Shell HSSE & SP Control Framework," R. Doc. No. 187-2, at 5-26.

program. 30 C.F.R. § 250.1900. There appears to be no factual dispute that Shell and Transocean executed a "SEMS Interface Document" applicable to the DEEPWATER NAUTILUS pursuant to the SEMS regulations.[17] The Interface Document refers to "Marine Operations" and states that, "[t]he Transocean Barge Supervisor supervises the marine department and ensures that all marine aspects of the rig's operations are carried out in accordance to statutory and regulatory controls and guidelines."[18] The Interface Document also refers to other documents containing "emergency procedures" for a variety of incidents, including "Approach by Unknown Vessel."[19] The Interface Document states that the role of a "Transocean Captain" is to "Provide marine command responsibility and support in ship's marine operations supervising operations, equipment and auxiliaries, ensuring compliance with operating procedures and maintenance requirements and international maritime regulations."[20]

The Interface Document also requires that "Shell and their service contractors will comply with Transocean's HSE management systems as detailed in the rig specific HSE Case and as further amended in this document," as well as with "the pertinent requirements of Shell's SEMS and Principles of Operation as amended/described by this document."[21] The Transocean Health Safety and Environment ("HSE") Case for the DEEPWATER NAUTILUS lists "Boat / ship collision" as a hazard and, under the heading "Preventive Controls," lists "Use of lookouts during transit," "Use of radars with CPA alarm," "Use of radio to contact approaching vessel," and "Rig location

---

[17] R. Doc. No. 187-1.
[18] R. Doc. No. 187-1, at 21.
[19] R. Doc. No. 187-1, at 31.
[20] R. Doc. No. 187-1, at 9.
[21] R. Doc. No. 187-1, at 4-5.

published in Notice to Mariners."[22] The document entitled the Shell "Assurance Protocols" includes a section on "Maritime Safety."[23]

Shell argues that the Interface Document should be excluded as irrelevant, although it does not expressly state why, nor does it address the other exhibits discussed by Tesla and International.[24] Shell's briefing does not adequately distinguish between admissibility issues with respect to the regulations, themselves, and the admissibility of documents prepared by Shell or Transocean pursuant to those regulations; this distinction is important, particularly because Tesla submits testimony from the deposition of a Shell representative that "in many respects, Shell's safety policies and procedures *exceed* what the government is dictating or demanding."[25] Furthermore, the Interface Agreement and the Transocean HSE Case appear facially to be probative of a number of factual issues in this case, such as Shell or Transocean's awareness of, and preparation for, the risk of collision or allision between other vessels and the DEEPWATER NAUTILUS.

Shell has not persuaded the Court that the documents discussed above are entirely inadmissible for any purpose at trial. Shell's motion *in limine* to exclude those documents entirely is denied subject to the Court revisiting the issue, if requested at trial, in context and with the benefit of expert testimony.

## C. Expert Testimony

Finally, Shell moves to exclude expert testimony regarding SEMS-related matters. Shell contends that neither International's expert, Mark Fazioli, nor Tesla's expert, Greg Daley, are

---

[22] R. Doc. No. 187-2, at 3.
[23] R. Doc. No. 187-2, at 9.
[24] R. Doc. No. 176-1, at 4 ("The documents covered by this motion include, but are not limited to," the "Shell/Transocean SEMS Bridging Agreement.").
[25] R. Doc. No. 187-3, at 2 (emphasis added).

experts in MODUs or the SEMS regulations applicable to MODUs, and that they therefore lack sufficient qualifications to testify regarding SEMS-related matters.[26]

First, the Court notes that the opinions Shell seeks to exclude relate for the most part to the Shell/Transocean documents, as opposed to any requirements of the SEMS regulations themselves. For example, Shell contends that Fazioli should not be permitted to testify regarding "the Shell-Transocean SEMS Interface agreement."[27] Likewise, the portions of Daley's report which Shell criticizes are based on Shell's alleged non-compliance with its own documents, and less directly based on the SEMS regulations themselves.[28] Shell's memorandum does not adequately address the distinction noted above between evidence or testimony regarding the SEMS regulations, themselves, and evidence or testimony regarding Shell or Transocean's own internal documents. Furthermore, without deciding whether Fazioli or Daley lack expertise regarding their knowledge of SEMS regulations, the Court is not persuaded at this time that they must be so qualified in order to render an expert opinion. The Court will be in a better position at trial to assess their respective qualifications, to compare such qualifications to their opinions, and to decide whether any deficiencies in their qualifications require limiting their testimony or whether such alleged

---

[26]R. Doc. No. 176-1, at 5-7.
[27]R. Doc. No. 176-1, at 6. The Court has been unable to locate in the record the pages of that portion of Fazioli's expert report.
[28]R. Doc. No. 180-4, at 3 ("A Safety & Environmental Management System ('SEMS') interface document was entered into between Shell and Transocean for safety and environmental management systems, including collision avoidance."); R. Doc. No. 180-4, at 20 ("Although Transocean and Shell agreed to a SEMS Interface Agreement (Exhibit 84) that was intended to be proactive and to recognize hazards, nothing was implemented by Shell or Transocean to avoid collisions."); R. Doc. No. 180-4, at 21 ("Shell/Transocean recognized the risk of collision as an instability hazard to the *NAUTILUS* in their SEMS plans. 30 CFR 250, Subpart S prescribes the SEMS plan under which under which Shell/Transocean wrote their HSE policies regarding anti-collision procedures . . . ."); *see also* R. Doc. No. 180-4, at 25 ("The lack of compliance with their own SEMS by Shell and Transocean was a cause of the incident.").

deficiencies go to the weight of their testimony. Accordingly, Shell's *in limine* motion is denied at this time with respect to any limitations on SEMS-related expert testimony without prejudice to Shell's right to raise specific objections at trial.

Accordingly, in light of the foregoing,

**IT IS ORDERED** that Shell's motion is **DENIED** without prejudice to Shell's right to re-urge its objections at trial.

New Orleans, Louisiana, September 16, 2015.

**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**